UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRYAN HANEY and SAM HOGUE,<br><br>    Plaintiffs,<br><br>v.<br><br>HUGHIE R. BLAKE, a married man, and the marital community of HUGHIE R. BLAKE and KELLY BLAKE, MARINE STAR, LLC, an Alaska Corporation, the F/V ODYSSEY (O.N. 646525), and the F/V SIERRA ALLENE (O.N. 125061),<br><br>    Defendants. | Case No. C15-1347RSL<br><br>MEMORANDUM OF DECISION |

This matter was heard by the Court in a bench trial commencing on March 6, 2017, and concluding on March 8, 2017. The parties submitted their closing arguments in writing on March 16, 2017. Bryan Haney and Sam Hogue brought this action alleging that their former employer, Hughie Blake, owed them money for work performed aboard Mr. Blake's fishing vessels over the course of several seasons between 2012 and 2014. Plaintiffs seek compensatory and punitive damages, as well as attorney's fees.

**FINDINGS OF FACT**

By a preponderance of the evidence, the Court finds as follows:

Hughie Blake owns and operates several small fishing vessels, which he uses for gillnetting, salmon- and herring-seining, longlining, and diving. Mr. Blake fishes in Prince William Sound off the shores of Alaska and sells his fish to Ocean Beauty Seafoods ("Ocean

MEMORANDUM OF DECISION - 1

Beauty"), a processor with offices in Seattle and a plant in Cordova, Alaska. Mr. Blake seasonally hires deckhands to help operate his fishing vessels and pays each deckhand a share of the fishing proceeds from the season worked. Those shares are generally set as a percentage and agreed to at the time of hire as a term of employment.

Ocean Beauty routinely loans money to fishermen who conduct regular business with it as an advance on future fish payments. Some of these loans are in the form of checks that Ocean Beauty issues on the fisherman's behalf. Ocean Beauty documents its payments and loans to each fisherman as an account in that fisherman's name. Both Hughie Blake and Bryan Haney had accounts with Ocean Beauty during the seasons in question.

By Mr. Blake's own account, he is "not very good with books," and as a result, during the 2012 and 2013 fishing seasons at issue here, his "books were a mess" and had "a lot of mistakes." Mr. Blake describes himself as a "positive guy" who "want[s his] guys to be happy," and the Court finds that some of the misunderstandings between the plaintiffs and Mr. Blake likely resulted from Mr. Blake's tendency to exaggerate numbers and over-promise out of a desire to make his crew members happy.

**A.  Sam Hogue**

  1.  *2012 Season*

In 2012, Mr. Blake hired Sam Hogue to work as a deckhand during the salmon-seining season from roughly June to August, and to perform certain pre-season work on Mr. Blake's fishing vessel, the *F/V Odyssey*, before the salmon-seining season got underway. At the time, Mr. Hogue was a college student on summer vacation. He had found the summer job with Mr. Blake through a friend of his parents. (Mr. Hogue worked for Mr. Blake the previous summer, as well, but only the 2012 and 2013 seasons are at issue in this case.)

That May, while the *Odyssey* was in dry-dock in Cordova, Mr. Hogue performed various repair and maintenance tasks to prepare the boat for the salmon-seining season, such as sanding the bottom of the boat, applying primer and gel-coat, removing old wiring, and replacing the boat's hot-water heater. During this time, Mr. Hogue lived on the boat, and Mr. Blake did not

MEMORANDUM OF DECISION - 2

charge him for room or board.

On May 27, 2012, Mr. Blake gave Mr. Hogue a check for $2,000, which Ocean Beauty had issued on Mr. Blake's account. Based on a conversation with Mr. Blake about the amount of pre-season work he had performed on the *Odyssey*, Mr. Hogue understood this $2,000 to be a payment for his pre-season work. On the Ocean Beauty ledger for Mr. Blake's account, however, this $2,000 check is noted as a "2012 Season Advance" to Mr. Hogue.

As the salmon-seining season got underway at the beginning of July 2012, Mr. Hogue understood that Mr. Blake's boat would be fishing in a "co-op" – that is, a joint venture between two fishing vessels where the boats shared certain operating costs and pooled their proceeds for the season. Mr. Blake and Mr. Hogue agreed that Mr. Hogue's compensation would be 9% of the *Odyssey*'s share of a two-boat co-op, less 4% of that sum, which would go toward the co-op's spotter pilot's fee. Mr. Hogue and Mr. Blake did not create a written employment agreement for the 2012 season.

Using the above figures and the receipts from the *Odyssey*'s fish sales to Ocean Beauty (known as "fish tickets"), Mr. Hogue now estimates his total wages due from the 2012 salmon-seining season to be $24,813.57: $22,492.87 for Mr. Hogue's share of the 2012 season fish tickets; plus $2,320.70 for Mr. Hogue's share of a $26,859.92 production bonus that Ocean Beauty paid to Mr. Blake on March 14, 2013 to reward his business during the 2012 season.

On August 23, 2012, at the end of the salmon-seining season, Mr. Blake paid Mr. Hogue $20,000. On March 10, 2013, Mr. Blake paid Mr. Hogue an additional $2,915.22. Mr. Blake eventually issued Mr. Hogue a 1099 tax form listing Mr. Hogue's total fishing-boat proceeds for 2012 as $24,374.61, which, in addition to the payments for $20,000 and $2,915.22, included $1,459.39 representing the value of Mr. Hogue's portion of the groceries that Mr. Blake bought for the crew during the 2012 season. Mr. Hogue now claims that Mr. Blake owes him an additional $1,898.35 for the 2012 season: the difference between the $24,813.57 that he calculates he is owed and the $22,915.22 that he was paid.

Mr. Blake does not dispute that Mr. Hogue was due $24,813.57 in 2012 (in fact, he

MEMORANDUM OF DECISION - 3

submits that Mr. Hogue was due $24,823.01, apparently double-counting certain retroactive salmon-price adjustments, known as "retros"). Rather, Mr. Blake claims that the $2,000 payment on May 27, 2012 was an advance on Mr. Hogue's salmon-seining compensation rather than payment for Mr. Hogue's pre-season work, and accordingly that he *overpaid* Mr. Hogue in 2012 ($24,915.22 paid for $24,823.01 due). Mr. Blake concedes that "there was probably a misunderstanding about" whether the $2,000 was an advance or a payment for Mr. Hogue's pre-season work, and the Court finds that Mr. Blake offered to pay Mr. Hogue $2,000 as compensation for his pre-season work, and that Mr. Hogue accepted that offer.

2. *2013 Season*

In June 2013, Mr. Blake again hired Mr. Hogue to work as a deckhand during the summer salmon-seining season. Mr. Blake and Mr. Hogue once again agreed that Mr. Hogue's compensation would be 9% of the *Odyssey*'s share of a co-op (this year between three boats), less 4% of that sum for the co-op's spotter pilot's fee. As before, Mr. Hogue and Mr. Blake did not create a written employment agreement for the 2013 season.

The 2013 salmon season in Prince William Sound was spectacularly productive, and the *Odyssey* was extremely successful. Based on his understanding of his compensation and the *Odyssey*'s 2013 Ocean Beauty fish tickets, Mr. Hogue now estimates his total wages due from the 2013 salmon-seining season to be $65,260.47: $57,541.39 for Mr. Hogue's share of the 2013 season fish tickets[1]; plus $4,320 for Mr. Hogue's share of a $50,000 "Seiner Compensation" that Ocean Beauty paid to Mr. Blake in October 2013 to compensate for Ocean Beauty's failure to maximize the *Odyssey*'s revenue during the profitable 2013 season; plus $3,399.08 for Mr. Hogue's share of a $39,341.17 production bonus that Ocean Beauty paid to Mr. Blake on April 24, 2014.

---

[1] Mr. Hogue's 2013 fish-ticket share of $57,541.39 includes a duplicate $1,462.93 share of an August 5, 2013 fish ticket that was double-counted due to an error in Ocean Beauty's ledger. Because this error appeared in Ocean Beauty's ledger, Mr. Blake was paid twice for the August 5, 2013 fish ticket, and so his crew is due double shares of that double-counted ticket. Mr. Blake testified that he is not seeking repayment of the duplicate share from his crew.

MEMORANDUM OF DECISION - 4

On August 24, 2013, when Mr. Hogue left the vessel to return to college slightly before the end of the salmon-seining season, Mr. Blake paid Mr. Hogue $50,000. On November 25, 2015, after this lawsuit was filed, Mr. Blake sent Mr. Hogue a check for $15,558.67.

Mr. Blake calculates Mr. Hogue's total compensation due in 2013 as $65,424.33 (Mr. Hogue's share of the *Odyssey*'s revenue up to August 23, 2013, when he left the boat, plus Mr. Hogue's share of Mr. Blake's 2013 Seiner Compensation). While Mr. Blake could not recall how he arrived at the $15,558.67 figure for the check that he sent Mr. Hogue in November 2015, he testified that this check, combined with the $50,000 payment and a $531.90 plane ticket that he bought for Mr. Hogue, totaled $66,090.57 and thus exceeded the total compensation of $65,424.33 owed to Mr. Hogue.[2] By contrast, the sum of the two checks paid to Mr. Hogue ($65,558.67) exceeds Mr. Hogue's estimate of his 2013 wages due ($65,260.47) by $298.20.

In sum, Mr. Hogue estimates that Mr. Blake underpaid him in 2012 by $1,898.35 and overpaid him in 2013 by $298.20. Accordingly, Mr. Hogue now seeks the net of $1,600.15.

**B.  Bryan Haney**

Between 2012 and 2014, Mr. Blake was involved in a series of complicated financial arrangements with Bryan Haney. The two men first met in Alaska in 2008, and after Mr. Haney worked for Mr. Blake that year, the two developed a friendship, various business partnerships, and something of a mentor-mentee relationship.

  1.  *2012 Season*

In spring 2012, Mr. Haney was temporarily living with Mr. Blake and his wife, Kelly Blake. Mr. Blake had agreed to let Mr. Haney borrow one of his gillnetting vessels, and Mr. Haney was putting together an application for a loan from the state of Alaska so that he could buy a gillnet-fishing permit. For his application to be successful, Mr. Haney would need

---

[2] Mr. Blake initially issued Mr. Hogue a 1099 tax form listing Mr. Hogue's total fishing-boat proceeds for 2013 as $54,489.84. The $4,489.84 discrepancy between the proceeds declared on the 1099 and the $50,000 check issued is not explained. After this litigation began and Mr. Blake sent Mr. Hogue the second check in November 2015, Mr. Blake issued Mr. Hogue a corrected 1099 form listing his 2013 fishing-boat proceeds as $66,090.57.

MEMORANDUM OF DECISION - 5

to have "a certain amount of cash on hand," and Mr. Blake offered to loan Mr. Haney $35,000 for this purpose. In early May 2012, $35,000 was transferred to Mr. Haney's bank account. Ocean Beauty records demonstrate that on May 3, 2012, a $35,000 loan was requested in Mr. Haney's name, though Mr. Haney denies requesting the loan himself. This loan request form provides that Mr. Haney will pay back "50% of fishing proceeds to [Ocean Beauty] until [the loan is] paid off."

Shortly after the transfer, Mr. Blake explained to Mr. Haney that the money had come from Ocean Beauty, and that Mr. Haney would need to fill out some paperwork at the Ocean Beauty office in Cordova. At the Cordova office, Mr. Haney signed paperwork agreeing to repay the $35,000 loan from Ocean Beauty. Mr. Haney got the impression that Mr. Blake was planning to pay off the $35,000 loan on his behalf, and understood that Mr. Blake was encouraging him to "put it out of [his] mind completely."

Around May 15, 2012, Mr. Haney's application for a state loan was denied, and he used the $35,000 Ocean Beauty loan to lease a gillnetting permit so that he could fish using the borrowed vessel from Mr. Blake. Ultimately, however, Mr. Blake loaned that vessel to his twin brother, Ron Blake, and instead Mr. Blake agreed to loan Mr. Haney a different vessel, the *F/V Carol M*. The *Carol M*. was still undergoing maintenance at the beginning of the gillnetting season, so Mr. Haney arranged to temporarily lease a different vessel from a man named Joe Arvidson in exchange for 30% of the proceeds from Mr. Haney's gillnetting fish tickets, a payment that Ocean Beauty would automatically deduct from Mr. Haney's account and transfer to Joe Arvidson's account. Mr. Haney made two payments to Mr. Arvidson through this arrangement: $544.29 on May 31, 2012; and $768.53 on June 3, 2012. In June 2012 Mr. Haney also made two payments toward his $35,000 debt to Ocean Beauty ($1,966.31 and $2,139.21, which were automatically deducted as a percentage from Mr. Haney's gillnetting fish tickets).

Once the *Carol M*. was out of the shop, Mr. Haney switched to that vessel. It had so many mechanical problems, however, that Mr. Haney eventually arranged through Mr. Blake to sublease his gillnetting permit to a fisherman named Sam Joselyn, who was leasing a vessel from

MEMORANDUM OF DECISION - 6

Mr. Blake. Mr. Haney agreed to sublease the permit to Mr. Joselyn for $15,000. Mr. Blake agreed to pay Mr. Haney this $15,000 on Mr. Joselyn's behalf by making payments to Ocean Beauty toward Mr. Haney's $35,000 loan debt, using proceeds from Mr. Joselyn's lease payments for the use of Mr. Blake's vessel. After the season ended, Mr. Haney and Mr. Blake agreed to lower the price of the permit sublease to $10,000. Mr. Blake ultimately did not pay anything toward Mr. Haney's Ocean Beauty loan debt. Mr. Haney did not pay Mr. Blake any money in exchange for his use of the *Carol M*.

Later, Mr. Haney saw that his Ocean Beauty account had been billed for repairs to the *Carol M*. ($5,854.18 and $718.55 on May 16, 2012), and he asked Ocean Beauty to transfer the charges to Mr. Blake's account. To transfer the charges, Ocean Beauty required Mr. Blake's permission, which Mr. Blake eventually gave after the start of this litigation: in September 2016, Mr. Blake transferred Mr. Haney $6,572.73.

Mr. Blake also hired Mr. Haney to work on the *Odyssey* during the 2012 salmon-seining season. Mr. Blake and Mr. Haney did not create a written employment contract. Mr. Haney understood that Mr. Blake's boat would be fishing in a three-boat co-op, and Mr. Blake and Mr. Haney agreed that Mr. Haney would receive as compensation 9% of the *Odyssey*'s one-third co-op share for the salmon-seining season, less 4% of that sum for the co-op's spotter pilot's fee, and that he would be paid shortly after the season ended.

Using the above figures and the *Odyssey*'s fish tickets, Mr. Haney estimates his total wages due from the 2012 salmon-seining season to be $24,813.57 (the same as Mr. Hogue's): $22,492.87 for Mr. Haney's share of the 2012 season fish tickets; plus $2,320.70 for Mr. Haney's share of Mr. Blake's $26,859.92 production bonus for the 2012 season.

Mr. Haney received several advances on these seining wages: on April 30, 2012, Mr. Blake gave Mr. Haney a check for $3,500, and on July 13, 2012, Mr. Blake gave Mr. Haney a check for $500. At the end of the season, on August 24, 2012, Mr. Blake paid Mr. Haney $4,000. On December 31, 2012, Mr. Blake paid Mr. Haney an additional $2,800. Mr. Blake eventually issued Mr. Haney a 1099 tax form listing Mr. Hogue's total fishing-boat proceeds for

MEMORANDUM OF DECISION - 7

2012 as $24,374.61, which, like Mr. Hogue's 2012 1099 form, included $1,459.39 representing the value of Mr. Haney's portion of the groceries that Mr. Blake bought for the crew during the 2012 season. Mr. Haney now claims that Mr. Blake owes him an additional $14,013.57 for the 2012 season: the difference between the $24,813.57 that he calculates he is owed and the $10,800 that he was paid.

Mr. Haney calculates that this debt is further modified by various loans that Mr. Blake and Mr. Haney issued to each other that fall. In September 2012, Mr. Blake loaned Mr. Haney $1,000 to purchase diving equipment, and in October 2012, Mr. Blake loaned Mr. Haney an additional $500. Also in September 2012, Mr. Haney loaned Mr. Blake $220 and then $3,838.16 for vessel moorage and repairs, respectively.

Mr. Blake asserts that any debt to Mr. Haney is offset by Mr. Haney's share of the cost of a piece of diving equipment – a "Nitrox compressor" – that Mr. Blake bought in August 2012 for the two men to use during a joint commercial diving venture that they planned to begin in October 2012. Mr. Blake paid $23,590.81 for the compressor and related equipment, and Mr. Haney arranged to buy it from Mr. Blake over time by paying Mr. Blake a portion of his 2012 crew share, followed by three annual payments of $5,000 per year. As to the joint diving venture, Mr. Haney issued Mr. Blake a 1099 tax form listing $9,331.61 in proceeds for 2012: Mr. Haney offset this amount from Mr. Blake's debt to him rather than paying him directly.

2. *2013 Season*

In March 2013, Mr. Haney received an email from Ocean Beauty, informing him that he had a negative account balance of roughly $36,000 and asking him about the status of his efforts to repay the $35,000 loan. Mr. Haney forwarded that email to Mr. Blake and his wife, and Mr. Blake told Mr. Haney not to worry; that he, Mr. Blake, would "talk to" Ocean Beauty about transferring Mr. Haney's debt to his own account.

In June 2013, Mr. Blake again hired Mr. Haney to work as a deckhand during the salmon-seining season. Mr. Blake and Mr. Haney once again agreed that Mr. Haney's compensation would be 9% of the *Odyssey*'s share of a three-boat co-op, less 4% of that sum for the co-op's

MEMORANDUM OF DECISION - 8

1  spotter pilot's fee. As before, Mr. Haney and Mr. Blake did not create a written employment
2  agreement for the 2013 season.

3  Based on his understanding of his compensation and the *Odyssey*'s 2013 Ocean Beauty
4  fish tickets, Mr. Haney now estimates that his total wages due from the 2013 salmon-seining
5  season are $72,075.31: $64,098.94 for Mr. Haney's share of the 2013 season fish tickets[3]; plus
6  $4,320 for Mr. Haney's share of a $50,000 "Seiner Compensation" that Ocean Beauty paid to
7  Mr. Blake in October 2013 to compensate for Ocean Beauty's failure to maximize the *Odyssey*'s
8  revenue during the profitable 2013 season; plus $3,656.37 for Mr. Haney's share of Mr. Blake's
9  $39,341.17 production bonus. On top of that $72,075.31, Mr. Haney also estimates that he is
10 due an additional $4,500 for his share of the *Odyssey*'s portion receivable from the higher-
11 grossing boats in the three-boat co-op. Mr. Blake denies that the co-op ever materialized in
12 2013, but concedes that he told his crew that they would be fishing in a co-op.

13 As in 2012, Mr. Haney received an advance on his seining wages: on July 18, 2013,
14 Mr. Blake gave Mr. Haney a check for $9,000. At the end of the season, on September 20, 2013,
15 Mr. Blake paid Mr. Haney $15,000 (in separate transfers of $10,000 and $5,000). On September
16 30, 2013, Mr. Blake paid Mr. Haney an additional $10,000. And on December 19, 2013,
17 Mr. Blake paid Mr. Haney $40,000.[4]

18 Mr. Haney worked for Mr. Blake during the 2013 gillnetting season, as well. And during
19 the 2013 herring season, Mr. Haney worked for Mr. Blake's twin brother, Ron Blake, on the *F/V*
20 *Ace*. In June 2013, Ron Blake paid Mr. Haney $3,000 for that work.

---

[3] Mr. Haney's 2013 fish-ticket share of $64,098.94 includes a duplicate $1,462.93 share of an August 5, 2013 fish ticket that was double-counted due to an error in Ocean Beauty's ledger. Because this error appeared in Ocean Beauty's ledger, Mr. Blake was paid twice for the August 5, 2013 fish ticket, and so his crew is due double shares of that double-counted ticket. Mr. Blake testified that he is not seeking repayment of the duplicate share from his crew.

[4] Mr. Blake issued Mr. Haney a 1099 tax form listing Mr. Haney's total fishing-boat proceeds for 2013 as $76,286.72, apparently based on Mr. Haney's own calculations of what Mr. Blake had paid him for both the seining and gillnetting seasons. After this litigation began, Mr. Blake issued Mr. Haney a corrected 1099 listing his 2013 fishing-boat proceeds as $92,048.94.

MEMORANDUM OF DECISION - 9

As in 2012, Mr. Haney calculates that Mr. Blake's debt to him is further modified by various loans that Mr. Blake and Mr. Haney issued to each other over the course of the 2013 fishing seasons. At Mr. Haney's request, Mr. Blake's wife paid $35 to ship a package to Mr. Haney. At the end of the 2013 herring season, Mr. Blake bought Mr. Haney a $591.25 airplane ticket from Cordova to Austin, Texas. In May 2013, Mr. Blake loaned Mr. Haney $5,495 for recording equipment, plus an additional sum, roughly $330 but the precise amount unknown, representing the credit card interest on this purchase. In late May 2013 and early June 2013, Mr. Blake issued Mr. Haney an additional loan of $500, and paid $450 for a gillnet repair on Mr. Haney's behalf. In September 2013, Mr. Blake paid $131.25 to store diving equipment for Mr. Haney. In September and November 2013, Mr. Blake bought Mr. Haney plane tickets in the amount of $538 and $715.30, respectively. Mr. Haney also owed Mr. Blake $5,700 in diving proceeds for 2013 (as in 2012, this amount was listed on a 1099 issued by Mr. Haney, but Mr. Haney offset this amount from Mr. Blake's debt rather than paying him directly).

In June 2013, Mr. Haney loaned Mr. Blake $300 in cash, and covered Mr. Blake's $1,000 payment on a diving permit.

    3.    *2014 Season*

Mr. Haney worked for Mr. Blake during the 2014 herring season on the *F/V Cricket*. Mr. Haney understood that he would be paid 6% of the vessel's share of a co-op, less an unknown percentage for the spotter pilot's fee. (Mr. Blake testified that the herring spotter pilot's fee in 2014 was 10%, which Mr. Haney accepted as reasonable.) Mr. Haney estimates that he is due $1,800 for his work during the 2014 herring season, but this figure is not concrete. Mr. Blake paid Mr. Haney $2,000 in two separate installments, on May 5 and May 30, 2014.

Mr. Blake also hired Mr. Haney to work as a deckhand on another of Mr. Blake's boats, the *F/V Sierra Allene*, during the 2014 salmon-seining season. Again, Mr. Blake and Mr. Haney agreed that Mr. Haney's compensation would be 9% of the vessel's fish-ticket revenue, less 4% for the spotter pilot's fee. As before, Mr. Haney and Mr. Blake did not create a written employment agreement.

MEMORANDUM OF DECISION - 10

Based on his understanding of his compensation and the *Sierra Allene*'s 2014 Ocean Beauty fish tickets, Mr. Haney now estimates his total wages due from the 2014 salmon-seining season to be $22,830.87: $21,012.97 for Mr. Haney's share of the 2014 season fish tickets; plus $1,817.90 for Mr. Haney's share of Mr. Blake's $21,040.48 production bonus. Mr. Haney also estimates that he is due an additional $1,500 for his share of the *Odyssey*'s portion receivable from the higher-grossing boats in the three-boat co-op. To this 2014 debt, Mr. Haney adds $637.11 that he spent on groceries for the vessel on Mr. Blake's behalf. Thus, Mr. Haney calculates his total amount owed for the 2014 salmon season as $24,967.98.

On August 6, 2014, Mr. Blake paid Mr. Haney $10,000 (in two separate transfers). Following the end of the salmon season, at the urging of repeated calls and text messages from Mr. Haney, Mr. Blake made a series of payments to Mr. Haney in the following amounts: September 12, 2014, $6,195.93; January 30, 2015, $440; February 5, 2015, $450; February 19, 2015, $250; March 18, 2015, $1,000; March 23, 2015, $1,500; April 23, 2015, $1,710. In all, for the 2014 salmon-seining season, Mr. Blake paid Mr. Haney $21,545.93.

In late August 2014, Mr. Haney discovered an envelope addressed to him on the floor of Mr. Blake's car: this was a letter to Mr. Haney from Ocean Beauty dated April 28, 2014, stating that Mr. Haney's account had a negative balance of $36,897.92, which included the outstanding debt on his $35,000 loan, plus various charges for fuel and other seasonal expenses. At the time, Mr. Haney shared a P.O. box with Mr. Blake. Mr. Blake had read the letter in early May 2014, but he had not mentioned the letter to Mr. Haney at that time because he wanted to avoid upsetting him at the beginning of the salmon-seining season. When Mr. Haney confronted Mr. Blake about the letter, Mr. Blake apologized and said that he would straighten things out with Ocean Beauty's headquarters as soon as possible.

As of August 22, 2014, Mr. Haney's Ocean Beauty account had a negative balance of $36,897.92. Ocean Beauty sent Mr. Haney's account to collection in 2015. Mr. Haney and Mr. Hogue filed this lawsuit on August 23, 2015.

MEMORANDUM OF DECISION - 11

**CONCLUSIONS OF LAW**

**A.     Rate of Pay and Wages Due**

Based on the foregoing facts, the Court concludes that Mr. Hogue and Mr. Haney were entitled to compensation for their work during the 2012, 2013, and (as to Mr. Haney) 2014 salmon-seining seasons at a rate of 9% of the vessel's gross, less 4% for a spotter pilot's fee.[5] Mr. Blake failed to issue written employment agreements to Mr. Hogue and Mr. Haney in violation of 46 U.S.C. § 10601, and accordingly, under 46 U.S.C. § 11107, Mr. Hogue and Mr. Haney are entitled to recover the higher of (1) the highest rate of wages for deckhands with the same rating or similar duties hired at the same port of engagement (here, Cordova), or (2) the amount agreed to be given to plaintiffs. See TCW Special Credits v. Chloe Z Fishing Co., Inc., 129 F.3d 1330, 1333–34 (9th Cir. 1997). The rate orally agreed on by the parties was 9% of the vessel's gross, less 4% for the pilot's fee, and the plaintiffs have not shown by a preponderance of the evidence that the highest rate of wages for similarly rated deckhands from the port of Cordova exceeded that rate. Though plaintiffs point to the rates that Mr. Blake paid to Jim Nulph, the plaintiffs' fellow deckhand – 10.8% at one point, and 11.7% at another – the Court finds that the extra 1.8% and 2.7%, respectively, are attributable to lease agreements between Mr. Blake and Mr. Nulph and accordingly do not constitute higher *wage* rates.

Applying the rate described above, Mr. Hogue has shown by a preponderance of the evidence that Mr. Blake underpaid him in 2012 by $1,898.35 and overpaid him in 2013 by $298.20. Accordingly, Mr. Hogue is now entitled to compensatory damages in the amount of $1,600.15.[6]

By contrast, in light of the extraordinarily complicated history of loans and debts between

---

[5] Though the parties variously characterize this rate as "9% *after* pilot's fee" and "9% *less* pilot's fee," the rate works out to be the same: ((gross x 0.96) x 0.09) = ((gross x 0.09) x 0.96).

[6] The Court finds that Mr. Blake's late payment of $15,558.67 to Mr. Hogue was not willful or in bad faith, and declines to draw an adverse inference regarding the whereabouts of the original version of that check.

MEMORANDUM OF DECISION - 12

Mr. Blake and Mr. Haney, which includes various exchanges of unknown or renegotiated amounts, Mr. Haney has not shown by a preponderance of the evidence that Mr. Blake failed to pay him the salmon-seining wages he was due in 2012, 2013, and 2014 in the form of credit against his running debt to Mr. Blake. See Escobar v. S.S. Washington Trader, 640 F.2d 1063, 1065 (9th Cir. 1981) (per curiam) (holding that expenditures made by employer on seaman's behalf were valid partial payments of wages due where seaman was personally responsible for those expenses and where seaman expressly approved the expenditures on his behalf).

Mr. Blake also violated 46 U.S.C. § 10601 as to Mr. Haney's work during the 2013 and 2014 herring seasons. Mr. Haney is entitled to recover compensation at the agreed rate of 6% gross less 10% for the pilot's fee, but as with Mr. Haney's salmon-seining wages, Mr. Haney has not shown by a preponderance of the evidence that he did not receive the compensation due in the form of credit against his running debt.

Though plaintiffs argue that 46 U.S.C. § 11109(b) outlaws the practice of offsetting wages with other debts, that provision concerns judicial garnishments and attachments of wages. See Aguilera v. Alaska Juris F/V, O.N. 569276, 535 F.3d 1007, 1009 (9th Cir. 2008); Webster v. Washington State Ferries, No. C11-5040BHS, 2011 WL 351699, at *2 (W.D. Wash. 2011). And because Mr. Haney's debts to Mr. Blake were for concrete (if not fixed) monetary sums, the skepticism of unliquidated counterclaims identified in Isbrandtsen Co. v. Johnson, 343 U.S. 779, 787–88 (1952), is not warranted here. While a policy against fishing wage offsets might well be prudent given seamen's unique dependence on vessel owners and their subsequent vulnerability to wage abuses, the Court is aware of no law that would support such a holding in this case.

In sum, while it appears that Mr. Blake did at one time owe Mr. Haney money, the Court is not able to ascertain from this record when that debt was incurred or in what amount, and whether it has since been satisfied.

**B.    Contractual Duty of Good Faith and Fair Dealing**

Under federal contract law and in the context of admiralty law governing a seaman's rights and remedies, employment contracts – even oral ones – carry with them a duty to act in

MEMORANDUM OF DECISION - 13

good faith and to deal fairly in performing and enforcing that contract. Flores v. American Seafoods Co., 335 F.3d 904, 913 (9th Cir. 2003); Thorman v. American Seafoods Co., 421 F.3d 1090, 1099 (9th Cir. 2005) (declining to recognize that vessel owners have a fiduciary duty to disclose internal pricing/accounting methodologies but "underscor[ing] that vessel owners remain bound by the general duty to act in good faith and to deal fairly in performing and enforcing the contracts" (internal quotation marks omitted)). Based on the foregoing facts, the Court concludes that Mr. Haney has shown by a preponderance of the evidence that Mr. Blake breached his duty to deal fairly in performing their oral employment contract.

Mr. Blake represented to Mr. Haney that he would assume Mr. Haney's debt to Ocean Beauty, implying that he would add that debt to the running "back and forth" ledger of debts and loans between Mr. Blake and Mr. Haney. Then, Mr. Blake deliberately concealed Ocean Beauty's collection efforts from Mr. Haney and misrepresented his own efforts to satisfy Mr. Haney's debt. Mr. Blake had reason to know that Mr. Haney believed Mr. Blake was paying down Mr. Haney's debt, yet he failed to correct that misunderstanding even as Mr. Haney detrimentally relied on it. In doing so, Mr. Blake misrepresented the status of his own debt to Mr. Haney, because satisfaction of Mr. Haney's Ocean Beauty debt would also have satisfied Mr. Blake's wage debt to Mr. Haney. This willful misrepresentation violated Mr. Blake's duty of fair dealing in performance of his oral employment contract with Mr. Haney, regardless of whether Mr. Blake ultimately satisfied his wage debt to Mr. Haney through other loans and credits.

The Court finds that Mr. Haney was damaged by Mr. Blake's breach of his contractual duty of fair dealing in the amount of $10,000: that is, the amount that Mr. Blake told Mr. Haney he would pay to Ocean Beauty toward Mr. Haney's $35,000 debt, as payment for Mr. Haney's sublease of his gillnet fishing permit to Sam Joselyn. In reliance on Mr. Blake's representation that he would make that $10,000 payment – or that he had already done so – and as a result of Mr. Blake's deliberate concealment of the fact that he had not actually made this payment, Mr. Haney failed to make efforts to reduce his debt by that amount. Accordingly, Mr. Haney is

MEMORANDUM OF DECISION - 14

entitled to damages of $10,000 from Mr. Blake.

**C.  Punitive Damages and Attorney's Fees**

The Court declines to address whether punitive damages are available in this case, as even if such damages were available, they would not be warranted.

As the Court finds no statutory or equitable basis to award attorney's fees in this case, see Golden Pisces, Inc. v. Fred Wahl Marine Const., Inc., 495 F.3d 1078, 1081 (9th Cir. 2007), the parties shall each bear their own attorney's fees and costs.

**CONCLUSION**

For all of the foregoing reasons, plaintiff Sam Hogue is entitled to judgment in the amount of $1,600.15 on his wage claim; defendants are entitled to judgment on plaintiff Bryan Haney's wage claim; and plaintiff Bryan Haney is entitled to judgment on his breach of contract claim, with damages in the amount of $10,000.  The Clerk of Court is directed to enter judgment accordingly.

DATED this 20th day of June, 2017.

*[signature]*
Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION - 15